IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ADAM TYRONE DAVIS, # 211952,      *
    Plaintiff,      *
        *
vs.      * CIVIL ACTION NO. 19-01126-KD-B
        *
CYNTHIA STEWART, *et al.*,      *
    Defendants.      *

## ORDER

Plaintiff Adam Tyrone Davis, an Alabama prison inmate proceeding *pro se* and *in forma pauperis*, filed the instant action seeking relief under 42 U.S.C. § 1983. This matter is now before the Court on Defendants Cynthia Stewart, Terry Raybon, Phillip Mitchell, Sandra Dailey, Michael Banks, Curtis Thompkins, Zachary Hard, and Tracy Craft's motion for summary judgment. (Docs. 50, 51, 78, 84, 85, 86, 87, 99). For the reasons set forth below, it is **ORDERED** that the motion for summary judgment is **GRANTED in part** and **DENIED in part.**

## I.   BACKGROUND

### A.   Davis's Pleadings.

Plaintiff Adam Tyrone Davis brings this action against Defendants Warden Cynthia Stewart, Warden Terry Raybon, Warden Phillip Mitchell, Lieutenant Sandra Dailey, Correctional Officer Curtis Thompkins, Lieutenant Michael Banks, Correctional Officer Zachary Hard, Correctional Officer Tracy Craft, Correctional

Officer Hasheem Bennett,[1] and Correctional Officer Damarius Pickett,[2] for failing to protect him from being stabbed by another inmate at Holman Correctional Facility ("Holman"),[3] and for failing to obtain timely medical care for him following the stabbing.

**1.    Original Complaint (Doc. 1).**

In his original complaint, dated December 17, 2019, Davis alleged that on August 31, 2019, at around 1:30 a.m., he "had a

[1] On May 16, 2022, Davis's claims against Defendant Bennett were dismissed without prejudice for lack of service of process pursuant to Rule 4(m) of the Federal Rules of Civil Procedure. (Doc. 101). The Court will therefore not address Davis's claims against Defendant Bennett in this Order.

[2] Davis named "Kevin Pickett" as a Defendant in his original complaint and first amended complaint, while his operative second amended complaint lists only a last name for Defendant Pickett. (See Doc. 1 at 10; Doc. 6 at 15-16; Doc. 41 at 3, 5-7). A Notice of Lawsuit and Request for Waiver of Service of Summons sent to "Kevin Pickett" at Holman was returned to the Court as undeliverable, with the notation that "there is no one named Kevin Pickett" who worked at Holman. (See Doc. 57). Thereafter, the Court ordered Davis to properly identify Defendant Pickett. (Doc. 61 at 2). Davis responded that he was "unsure if the name is D. Pickett, or D. Pickens & has no way to determine the truth." (Doc. 66). Based on a review of the post assignments on the night of the subject incident, the Court determined that Davis was apparently attempting to sue Correctional Officer Damarius Pickett. However, subsequent attempts to serve Damarius Pickett proved unsuccessful. (See Docs. 104, 105, 107, 109, 110, 112). Because service of process has not been effected as to Defendant Pickett, the Court will not address Davis's claims against Defendant Pickett in this Order. However, the Court notes that even if Defendant Pickett had been served, Davis has failed to provide sufficient evidence to establish a claim against him.

[3] Holman Correctional Facility is located in Escambia County, Alabama, which is located within the Southern Division of the Southern District of Alabama. See 28 U.S.C. § 81(c)(2).

misunderstanding" with inmate Arnold Frank "that resulted in"
Davis being stabbed multiple times by inmate Frank.  (Doc. 1 at
4).  Davis alleged that "there had been no security inside" his
housing unit (D-Dorm), "other than the head counts that were
conducted on the night of August 30, 2019."  (Id.).  Davis stated
that "[a]fter several inmates broke up the incident," he was taken
to Holman's Health Care Unit ("HCU") and was subsequently
transported to a free-world hospital "for about a week due to [his]
injuries."  (Id.).  Davis stated that there "was no security on
this post (D-dorm) & this incident would've been prevented had
there been someone on post."  (Id.).

Davis asserted claims against each of the Defendants for
either "Lack of Security" or "Breach of Security."  (Id. at 5-11).
Specifically, Davis brought claims for "Lack of Security" against
Wardens Stewart, Raybon, and Mitchell because "there wasn't any
security present in the dorm to prevent" the altercation in which
he was stabbed.  (Id. at 5, 11).  Davis also brought a claim for
"Lack of Security" against Lt. Dailey and alleged that, as shift
supervisor on the night of the incident, she "failed to make sure
the [correctional officers were] on their post or if these posts
were secured."  (Id. at 6).  Davis brought a similar claim for
"Lack of Security" against Lt. Banks, alleging that he "was an
assigned supervisor along with [Lt.] Dailey" on the night of the
incident, and that "[h]ad they made their rounds properly then

security would've been on his/her assigned post & eliminated the incident."  (Id. at 8).

Davis brought a claim for "Breach of Security" against Officer Thompkins.  (Id. at 7).  He alleged that Officer Thompkins "was assigned to be the rover of D-dorm" on the night of the incident, but "[a]fter the headcount of D-dorm [Officer] Thompkins left his post never to return until another count was due[,]" and that "[h]ad he been on his post his presence alone would've eliminated the altercation."  (Id.).  Davis also brought claims for "Breach of Security" against Officers Hard, Craft, Bennett, and Pickett based solely on the fact that they were on duty at Holman on the night of the incident, and Davis alleged that the "presence of any [correctional officer] assigned to night shift on Aug[ust] 30, 2019 could've eliminated the incident" in which he was stabbed. (Id. at 9-10).

**2.  First Amended Complaint (Doc. 6).**

In May 2020, Davis filed a first amended complaint without having been ordered to do so by the Court.  (Doc. 6).  Davis's first amended complaint was substantially similar to his original complaint but contained less detail.  (See id.).  In his first amended complaint, Davis alleged that on August 31, 2019, at around 12:30 a.m., he was stabbed multiple times "while inside [his] assigned living area D-dorm."  (Id. at 4).  Davis stated that "[t]hroughout the night of August 30, 2019 there was no security

4

in the dorm & hadn't been up until [his] stabbing." (Id.).
Specifically, Davis alleged that there was no officer monitoring
D-Dorm, and that no officers were present on the night of the
incident except to conduct a head count. (Id. at 12, 14, 16, 18,
20, 22, 24). Davis alleged that he was taken to the HCU by other
inmates after the attack and was "sent to the free world hospital
where [he] stayed 5 days & then sent back to the HCU for another
2 weeks." (Id. at 4). Davis brought claims for "Lack of Security"
against each of the ten Defendants based on the alleged absence of
a correctional officer monitoring D-Dorm on the night of the
incident. (Id. at 5-6, 12, 14, 16, 18, 20, 22, 24).

### 3. Second Amended Complaint (Doc. 41).

On July 30, 2020, the Magistrate Judge recommended that
Davis's claims against Defendants Hard, Craft, Bennett, and
Pickett be dismissed without prejudice for failure to state a claim
upon which relief could be granted, and that Davis be granted leave
to amend his claims against these Defendants for the sole purpose
of attempting to state a plausible claim against them.[4] (Doc. 14).
On September 17, 2020, the Report and Recommendation was adopted;
dismissed Davis's claims against Defendants Hard, Craft, Bennett,

---

[4] Because Davis's original complaint and first amended complaint
contained substantially similar facts, but the original complaint
provided more detailed information, the Court considered the
original complaint and first amended complaint together for
purposes of the Order. (See Doc. 14 at 2).

and Pickett without prejudice; and granted Davis leave to amend his claims in order to attempt to state plausible claims for relief against those Defendants. (Doc. 23).

In November 2020, Davis filed a second amended complaint, which is now his operative pleading. (Doc. 41). In his second amended complaint, Davis alleges that while he was sleeping in Holman's D-Dorm on August 31, 2019, at around 12:15 a.m., he was stabbed six times, including twice in the head, once in the neck, twice in the right ear, and once in the left thigh. (Id. at 4). Davis alleges that Officer Thompkins, "the officer assigned to the dorm," was not present during the start of the incident but "came during the physical altercation & hollered for the inmates to break-up whatever was going on." (Id.). Davis alleges that once the altercation was "semi-contained," Officer Thompkins observed Davis bleeding from the neck and ear and asked what was going on. (Id.). An unknown inmate allegedly responded: "[T]hat hoe done told his man likes playing w[ith] dicks & now the nigga tr[y]ing to kill him." (Id.). Officer Thompkins allegedly replied: "I'm leaving. I'm going to get the [lieutenant,] it's count time, get this shit cleaned up." (Id.). Davis alleges that Officer Thompkins left the dorm without taking him to the HCU, and "[a]t that moment [Davis] was struck from behind." (Id.).

Davis states that the next thing he remembers is lying on the floor with Officer Thompkins and Lt. Dailey standing over him and

asking him what happened, who did this to him, and whether he could walk.  (Id.).  Davis alleges that Lt. Dailey asked Officer Thompkins: "[W]hy didn't you call me, a code, & where were you during this[?]"  (Id.).  Officer Thompkins allegedly replied: "[T]hat's the gay shit I told you was going on in Delta Unit." (Id.).

According to Davis, Officer Thompkins asked Lt. Dailey what they were going to do, and Lt. Dailey responded: "It's almost breakfast time & I know he probably gotta go out the back gate." (Id. at 5).  Davis alleges that Lt. Dailey told some inmates to hide him in the T.V. room and cover up the blood so the other correctional officers would not be able to see it during the count. (Id.).  Davis asserts that Lt. Dailey and Officer Thompkins then left the dorm without taking him with them.  (Id.).

Davis alleges that after a couple of inmates took him to the T.V. room and covered him with a blanket, Lt. Dailey, Lt. Banks, Officer Thompkins, Officer Craft, Officer Hard, Officer Pickett, and Officer Bennett entered D-Dorm and announced that it was time for the count.  (Id.).  Davis states that Lt. Banks, Officer Craft, Officer Hard, Officer Pickett, and Officer Bennett entered the T.V. room and told him to go to his bed.  (Id.).  Davis states that when he stood up, the officers called for Lt. Dailey.  (Id.). Davis alleges that upon entering the T.V. room, Lt. Dailey explained the situation by stating that Davis was stabbed due to

"some gay relationship[,]" and that he was going to just lay in the T.V. room until he calmed down and went to sleep. (Id.). Davis alleges that Lt. Dailey, Lt. Banks, Officer Craft, Officer Thompkins, Officer Hard, Officer Pickett, and Officer Bennett then exited D-Dorm and left Davis in the T.V. room. (Id.). Davis alleges that other inmates in D-Dorm subsequently noticed that he had passed out in the T.V. room and "got another inmate, nicknamed P.J.," to get Davis to the HCU by pushing him in a wheelchair. (Id. at 6).

Davis separates the "Claim[s] for Relief" in his second amended complaint into three categories. (See id.). First, Davis brings claims against Lt. Dailey, Lt. Banks, Officer Thompkins, Officer Hard, Officer Craft, Officer Bennett, and Officer Pickett for "failing to provide needed medical attention" in violation of the Eighth Amendment. (Id.). Second, Davis brings claims against Officer Thompkins for "refusal to protect & deter physical assaults from another inmate" in violation of the Eighth Amendment. (Id.). Third, Davis brings claims against Warden Stewart, Warden Raybon, Warden Mitchell, Lt. Dailey, and Lt. Banks for violating the Eight Amendment by "refusing to adequately train subordinates with adequate S.O.P. [and]/or public policy of institution" and failing "to competently supervise subordinates[.]" (Id.). For relief, Davis seeks a declaratory judgment stating that Defendants

violated his rights under the Eighth Amendment, as well as compensatory and punitive damages. (Id. at 7).

### 4. Witness Affidavits (Docs. 41-1, 41-2).

Attached to Davis's second amended complaint are affidavits from two inmates who allegedly witnessed the subject incident. (Docs. 41-1, 41-2). In the first affidavit, inmate Ronald Lee Veal states that late on the night of August 30-31, 2019, he was awakened by Davis "hollering, pleading, & trying to fight off his attacker[,]" inmate Arnold Frank, who was stabbing Davis "with a home made ice-pick type of knife." (Doc. 41-1 at 1). Veal avers that this "assault" went on for about fifteen minutes, and that another inmate, Richard Herring, got between Davis and inmate Frank and tried "to stop the assault & end the conflict." (Id.).

Veal states that while inmate Herring was trying to stop the altercation, Officer Thompkins "came into that crowd of inmates that had circled around the stabbing incident." (Id.). Veal avers that he then "observed [Officer] Thompkins leaving from the crowd, alone, and without Davis." (Id.). According to Veal, he then observed the "fighting-stabbing-conflict" between Davis and inmate Frank "go on for about 15 minutes more after [Officer] Thompkins left the scene." (Id.).

Veal avers that "[l]ater on, after the second round of assault," Officer Thompkins re-entered the dorm with Lt. Dailey and walked up to Davis, "but they did not take Davis out of the

dorm with them when they left the dorm." (Id. at 2). Veal states that "Davis was later taken to the infirmary by an inmate nicknamed 'P.J.'" (Id.).

In the second affidavit, inmate Richard Herring states that while he was washing clothes in the shower area of D-Dorm at around 12:00 a.m. on August 31, 2019, he watched Davis "being assaulted" by inmate Frank for approximately fifteen to twenty minutes. (Doc. 41-2 at 1). Herring states that after no one would get in to stop the confrontation, he exited the shower, got between Davis and inmate Frank "to try to stop the assault[,]" and observed Davis bleeding from stab wounds. (Id.). At this point, a crowd of inmates had circled Davis and Frank. (Id.). Herring avers that "there wasn't a correctional officer . . . located in the spot they normally would be located in the dorm" when the incident began. (Id.).

Herring states that while he was trying to keep Davis and inmate Frank apart, Officer Thompkins came into the crowd and separated Davis and Frank. (Id.). Herring states that after Officer Thompkins arrived on the scene, he left and went back to the shower. (Id.). However, Herring states that after he got back into the shower, inmate "Frank went back to stabbing on Davis as soon as [Officer] Thompkins left them unattended again." (Id. at 2). Herring avers that the second part of the altercation between Davis and inmate Frank continued for another fifteen to

twenty minutes, and that Lt. Dailey and Officer Thompkins then entered the dorm. (Id.). Herring states that Lt. Dailey and Officer Thompkins subsequently left the dorm, but "Davis was still in the dorm, bleeding, and was not taken to the medical unit at the time." (Id.). According to Herring, "[i]t was a good moment in time before an inmate named: 'P.J.,' took Davis to the medical unit." (Id.).

**B. Defendants' Answers and Special Reports.**

Defendants Stewart, Raybon, Mitchell, Dailey, Banks, Thompkins, Craft, and Hard filed answers denying Davis's allegations and asserting available immunity defenses. (Docs. 51, 84, 86). Defendants also filed supporting special reports and attached as exhibits their sworn affidavits; the Incident Report; the Duty Officer Report; the Post Assignment Roster and Duty Post Log for the night shift on August 30-31, 2019; the body charts for Davis and inmate Frank; and Davis's medical records. (Docs. 50, 78, 85, 87, 99).

The Incident Report states that at approximately 3:40 a.m. on August 31, 2019, Correctional Officer Hasheem Bennett observed Davis being brought to the entrance gate in a wheelchair, with blood running from his ear and nose. (Doc. 78-1 at 1). Officer Bennett reported the incident to Lt. Dailey, and Lt. Dailey escorted Davis to the HCU to be medically assessed by a nurse. (Id.). An examination revealed that Davis sustained puncture

wounds to the back of the neck and the right side of the ear. (Id.). At approximately 3:50 a.m., Officer Bennett escorted inmate Frank to the HCU, where he was found to have suffered puncture wounds to the left shoulder, mid-chest, and left side of the head, and a laceration to the left cheek. (Id.). Lt. Dailey questioned both inmates about the incident. (Id.). Inmate Frank alleged that Davis became upset when he saw Frank talking to another inmate in D-Dorm. (Id.). Davis admitted to fighting because he was just upset. (Id.). Both inmates were searched, and no weapons were found in their possession. (Id.). Doctor George Wilson was informed of the incident and advised that Davis needed to be transported to an outside facility for further medical treatment. (Id.). Inmate Frank was released from the HCU and processed to the Restricted Housing United pending disciplinary action for fighting with a weapon. (Id.). It was noted that Davis would also receive a disciplinary action for fighting with a weapon. (Id.). At approximately 4:53 a.m., Correctional Officers Robert Kelley and Tracy Craft exited the back gate transporting Davis by van to Atmore Community Hospital. (Id.). Davis was subsequently transferred to USA Medical Center for further medical treatment. (Id.). On September 4, 2019, Davis was transported back to Holman and was placed in the hospital ward for 23-hour observation. (Id.).

The Duty Officer Report lists essentially the same incident facts as the Incident Report, albeit in less detail.  (See id. at 3).[5]

Davis's body chart was requested by Lt. Dailey and signed by a nurse at 3:45 a.m. on August 31, 2019.  (Id. at 4).  The body chart reflects that Davis suffered a puncture wound to the right back of his neck and another to the right side of his neck.  (Id.). Davis did not provide a statement.  (Id.).  Inmate Frank's body chart was requested by Lt. Dailey and signed by a nurse at 3:50 a.m. on August 31, 2019.  (Id. at 5).  The body chart reflects that inmate Frank suffered three puncture wounds to the left shoulder, a puncture wound to the mid-chest, a puncture wound to the right shoulder, a puncture wound to the left side of the head, and a laceration to the left cheek.  (Id.).  Inmate Frank also did not provide a statement.  (Id.).

The Post Assignment Roster for the night shift on August 30-31, 2019, reflects, inter alia, that Lt. Dailey was assigned as Population Shift Commander, Lieutenant Banks was assigned as Restrictive Housing Unit Shift Commander, Officer Hard was assigned as Rover for A-Dorm, Officer Craft was assigned as Rover for B-Dorm, Officer Thompkins was assigned as Rover for C-Dorm, Officer Bennett was assigned as Rover for D-Dorm, and Officer Pickett was assigned as Rover for E-Dorm.  (Doc. 99-1 at 1).  The

---

[5] The Incident Report and Duty Officer Report were both completed by Lt. Dailey.  (See Doc. 78-1 at 1, 3).

Post Assignment Roster further reflects that the towers, cubicles, dorm rover posts, and segregation rover posts were fully manned. (See id.). Wardens Stewart and Raybon are not listed as being on duty or on call at the time of the incident, while Warden Mitchell was the backup On Call Duty Officer. (See id. at 1-3).[6]

The Duty Post Log reflects that during the institutional count at 10:30 p.m. on August 30, 2019, there were 493 inmates in Population (Dorms A-E), 194 inmates in Segregation, 147 inmates on Death Row, one inmate in the Infirmary, and four inmates outgated, for a physical total of 835 inmates and a grand total of 839 inmates. (Id. at 5). The Duty Post Log further reflects that at 3:39 a.m., Officer Thompkins reported "1 J-3 enroute to health care out of Delta unit via wheelchair pushed by J-3 Jones; escorted by CO's Thompkins & Bennett." (Id. at 5-6). The Duty Post Log reflects that at 3:52 a.m., Officer Hard reported "another J-3 enroute to health care out of dorms, escorted by 2 J-3's." (Id. at 6). The Duty Post Log reflects that at 4:27 a.m., Officer

---

[6] The Post Assignment Roster reflects that the prison was staffed as follows: (1) Shift Commander – Lt. S. Dailey, (2) RHU Shift Commander – Lt. M. Banks, (3) Shift Clerk – Denman, (4) Rover for Dorm A – CO Hard, (5) Rover for Dorm B - CO Craft, (6) Rover for Dorm C - CO Thompkins, (7) Rover for Dorm D - CO Bennett, (8) Rover for Dorm E - CO Pickett, (9) Hall Rover - BCO Canter, (10) Infirmary Rover - CO Johnson, (11) Perimeter 848 – CO Lett, (12) Tower 1 – CO Dailey, (13) Tower 2 – CO Colvin, (14) Cubicle 1 – CCO Pickett, (15) Cubicle 2 – CO House, (16) Cubicle 3 – CCO Tucker, (17) Cubicle 4 – CCO Foster/CO Roberts, (18) Cubicle 5 – CO Stewart, (19) Segregation Rover – CO Boudreaux, (20) Segregation Rover - CO Lee, (21) Segregation Rover - CO Kelley. (Doc. 99-1 at 1).

Bennett "picked up Van 841 keys, transport bag & ID printout on J-3 Davis." (Id.). The Duty Post Log reflects that at 4:53 a.m., Officers Craft and Kelley exited the facility with Davis in a van "enroute to Atmore Community Hospital ER." (Id.). The Duty Post Log further reflects that at 5:50 a.m., inmate Frank was moved to Segregation. (Id.).

In affidavits attached to their special reports, Wardens Stewart and Mitchell aver that they were not present at Holman when the incident occurred. (Doc. 78-5 at 1; Doc. 78-6 at 1). Warden Stewart avers that as the warden of a correctional facility, she was not responsible for the hiring process or appointments to fill vacant correctional officer positions. (Doc. 78-5 at 2). Warden Stewart states that a review of the post assignments for the date in question reflects that there was an adequate number of correctional staff on duty to provide security for the dormitories, and Wardens Raybon and Mitchell similarly aver that there was an adequate amount of security available. (Doc. 78-4 at 2; Doc. 78-5 at 2; Doc. 78-6 at 2). The wardens aver that Holman has several procedures in place to reduce incidents of violence.[7] (Doc. 78-4

---

[7] Wardens Stewart and Mitchell state that every inmate incarcerated by the Alabama Department of Corrections is oriented by a staff member, who explains the information provided in the inmate handbook, which sets forth ADOC's major rules, regulations, and policies that apply to everyone and are designed to help the inmate population live together as safely and comfortably as possible. (Doc. 78-5 at 2; Doc. 78-6 at 1).

at 2; Doc. 78-5 at 2; Doc. 78-6 at 2).  They state that frequent unannounced searches are conducted of an inmate's person, inmate living areas, and other areas of the facility; that all officers are required to conduct at least five random searches of inmates, their personal property, and their assigned living areas per day; that monthly area searches of the facility are also conducted; and that at the time of the subject incident, supervisors were required to make rounds every thirty minutes.  (Doc. 78-4 at 2; Doc. 78-5 at 2; Doc. 78-6 at 2).  Wardens Raybon and Mitchell further state that all assigned supervisors were supervised adequately; that corrective action was taken any time a supervisor's actions were found not to be following the regulation, policy, or written directive; and that various staff meetings addressed issues that were areas of concern with regulations or policies not being followed.  (Doc. 78-4 at 2; Doc. 78-6 at 2).  Warden Stewart also states that it is against ADOC's rules to engage in a physical altercation, and that inmates Davis and Frank created the situation at issue by failing to adhere to the rules.  (Doc. 78-5 at 3).

Lt. Dailey avers that as supervisor of the second shift, she ensures that all officers follow the rules and regulations set by ADOC, but she is "not responsible for ADOC training."  (Doc. 78-3 at 1).  Lt. Dailey states that during the time of the incident, she was conducting the institutional count in various areas of the facility along with several other officers.  (Id.).  Lt. Dailey

avers that there was an adequate number of correctional staff to provide security on the shift. (Id.). Lt. Dailey denies that she left Davis inside the dorm bleeding without getting medical attention and states that she never told an inmate to do anything for Davis as alleged. (Id.).

Lt. Banks avers that all allegations lodged against him are false. (Doc. 78-2 at 1). Lt. Banks states that he was not present in the area of the facility where the incident occurred because he was assigned as the Restricted Housing Unit Supervisor, and the alleged incident occurred in Population. (Id.). Lt. Banks avers that as a shift commander, he is not in charge of training subordinates or staff. (Id.). He states that all ADOC security personnel must complete training at the Training Academy, and that annual training is conducted by ADOC's Training Department. (Id.).

Officer Thompkins states that he was not assigned to D-Dorm on the date of the incident and notes that he was never mentioned in the Duty Officer Report. (Doc. 85-1). Officer Thompkins avers that at no time did he fail to protect Davis or provide him with medical care, and he asserts that Davis's claims are false and without merit. (Id.).

Officer Craft avers that he was not assigned to Davis's dormitory on the date of the incident, and that is why he could not get him medical help. (Doc. 87-3). Officer Craft also states that he does not recall the incident. (Id.).

Officer Hard avers that he has no recollection of the subject incident because he was on kitchen duty at that time.  (Doc. 87-2).

**C.    Conversion to Motion for Summary Judgment.**

In an order dated October 13, 2022, the Court converted Defendants Stewart, Raybon, Mitchell, Dailey, Banks, Thompkins, Hard, and Craft's answers and special reports (Docs. 50, 51, 78, 84, 85, 86, 87, 99) into a motion for summary judgment, explained to the parties the procedure for such motions under Federal Rule of Civil Procedure 56, and afforded the parties an opportunity to submit additional information or evidence in support of or in opposition to the motion by November 15, 2022.  (Doc. 108).  The Court also ordered Davis to inform the Court in writing, by November 15, 2022, whether he desired to continue the litigation of this action.  (Id. at 4).  Davis filed motions for extension of time (Docs. 114, 118), and the Court extended Davis's deadline to respond to the motion for summary judgment to February 16, 2023 (Docs. 115, 117), but Davis submitted no additional information or evidence in opposition to the converted summary judgment motion.

After a thorough review of the parties' submissions, the motion for summary judgment is ripe for consideration.

**II.  SUMMARY JUDGMENT STANDARD**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing there is no genuine dispute of material fact, or by showing or pointing out to the district court that the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Id. at 322-24.

"When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (per curiam) (quoting

Celotex, 477 U.S. at 324).   "To defeat a motion for summary judgment, the nonmoving party may not rely on 'mere allegations.' It must raise 'significant probative evidence' that would be sufficient for a jury to find for that party." LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 835 (11th Cir. 1998) (citations omitted).   In other words, there is no genuine issue for trial where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]"   Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

In considering whether the Defendants are entitled to summary judgment in this case, the Court views the facts in the light most favorable to Plaintiff Davis.   See Comer v. City of Palm Bay, Fla., 265 F.3d 1186, 1192 (11th Cir. 2001) (per curiam) ("We view the evidence and all factual inferences raised by it in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-moving party.").

> The requirement to view the facts in the nonmoving party's favor extends only to "genuine" disputes over material facts.   A genuine dispute requires more than "some metaphysical doubt as to the material facts."   A "mere scintilla" of evidence is insufficient; the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment.

Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (2009) (per curiam) (internal citations omitted).   In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary

20

judgment." <u>Resolution Trust Corp. v. Dunmar Corp.</u>, 43 F.3d 587, 599 (11th Cir. 1995).   Furthermore, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007).

## III. <u>DISCUSSION</u>

### A.   **Official Capacity Claims.**

Davis's complaint does not specify whether he is suing Defendants in their official and/or individual capacities.  (<u>See</u> Doc. 41).  "A claim asserted against an individual in his or her official capacity is, in reality, a suit against the entity that employs the individual." <u>Mann v. Taser Int'l, Inc.</u>, 588 F.3d 1291, 1309 (11th Cir. 2009).  The Defendants named in this action are all correctional officers employed by ADOC, an agency of the State of Alabama.  Thus, to the extent Davis sues Defendants in their official capacities, his claims functionally reduce to § 1983 claims against the State of Alabama itself.  <u>See</u> <u>Will v. Mich. Dep't Of State Police</u>, 491 U.S. 58, 71 (1989).

The Eleventh Amendment bars Davis's claims against Defendants in their official capacities.  <u>See, e.g.</u>, <u>Alabama v. Pugh</u>, 438 U.S. 781, 782 (1978); <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 100 (1984) (stating that with some exceptions, "a suit in

21

which the State or one of its agencies or departments is named as
the defendant is proscribed by the Eleventh Amendment"; Harbert
Int'l, Inc. v. James, 157 F.3d 1271, 1277 (11th Cir. 1998)
("[S]tate officials sued in their official capacity are ...
protected by the [Eleventh A]mendment."). Further, state officials
sued in their official capacities are not "persons" within the
meaning of § 1983, and monetary damages are unavailable for a §
1983 complaint naming state officials in their official capacities.
Edwards v. Wallace Cmty. Coll., 49 F.3d 1517, 1524 (11th Cir.
1995). Thus, to the extent Thomas brings his claims for
retrospective declaratory relief and monetary damages against
Defendants in their official capacities, such claims are barred.

    **B.   Individual Capacity Claims.**

    To the extent Davis is suing Defendants in their individual
capacities, Defendants have pled the defense of qualified immunity
against the allegations asserted against them. (See Doc. 50 at
12-13; Doc. 51 at 2; Doc. 78 at 19-20; Doc. 84 at 2; Doc. 85 at
13; Doc. 86 at 2; Doc. 87 at 6-7). "The defense of qualified
immunity completely protects government officials performing
discretionary functions from suits in their individual capacities
unless their conduct violates 'clearly established statutory or
constitutional rights of which a reasonable person would have
known.'" Marbury v. Warden, 936 F.3d 1227, 1232 (11th Cir. 2019)
(per curiam) (citations omitted). Since the record evidence

reflects that Defendants were acting within the scope of their discretionary authority at all relevant times, the burden shifts to Davis to show (1) that Defendants violated a constitutional right, and (2) that the right was clearly established at the time of the alleged violation.[8]   See id.

Defendants contend that Davis has failed to meet his burden with respect to the first qualified immunity prong because he has failed to show a constitutional violation.   (Doc. 50 at 12; Doc. 78 at 20; Doc. 85 at 13; Doc. 87 at 6).   The Court now turns to Davis's asserted claims to determine whether the summary judgment evidence creates a genuine issue of material fact as to whether Defendants violated a constitutional right.

**1.   Eighth Amendment - Failure to Protect.**

Davis seeks redress pursuant to 42 U.S.C. § 1983 for Eighth Amendment violations based on an attack by a fellow inmate.   (See

---

[8] "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right."   Reichle v. Howards, 566 U.S. 658, 664 (2012) (quotations omitted).   "In other words, existing precedent must have placed the statutory or constitutional question beyond debate."   Id. (quotation omitted).   For a right to be clearly established, either (1) "a materially similar case has already been decided"; (2) there is "a broader, clearly established principle that should control the novel facts of the situation"; or (3) "the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary."   Gaines v. Wardynski, 871 F.3d 1203, 1208 (11th Cir. 2017) (quotation omitted).   The controlling authority must be "from the Supreme Court of the United States, the Eleventh Circuit, or the highest court in the relevant state."   Id. at 1209.

Doc. 41).  Section 1983 creates a private right of action against any person acting under the color of state law who deprives another of a federal constitutional right.  See 42 U.S.C. § 1983.  The Eighth Amendment, applicable to the states through the Fourteenth Amendment, governs the conditions under which convicted prisoners are confined and the treatment they receive while in prison.  Farrow v. West, 320 F.3d 1235, 1242 (11th Cir. 2003); Bass v. Perrin, 170 F.3d 1312, 1316 (11th Cir. 1999).  The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.

The Eighth Amendment's proscription against cruel and unusual punishment imposes a duty on prison officials to take reasonable measures to guarantee the safety of inmates.  Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099 (11th Cir. 2014).  "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety."  Farmer v. Brennan, 511 U.S. 825, 834 (1994).  The Eleventh Circuit has stressed "that a 'prison custodian is not the guarantor of a prisoner's safety.'"  Purcell v. Toombs County, Ga., 400 F.3d 1313, 1321 (11th Cir. 2005) (citation omitted).

"A prison official violates the Eighth Amendment 'when a substantial risk of serious harm, *of which the official is*

*subjectively aware*, exists and the official does not respond reasonably to the risk.'" Caldwell, 748 F.3d at 1099 (emphasis in original) (citation omitted).  To survive summary judgment on an Eighth Amendment claim under § 1983, a plaintiff must "produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." Hale v. Tallapoosa County, 50 F.3d 1579, 1582 (11th Cir. 1995).

The first element — a substantial risk of serious harm — is measured against an objective standard.  Caldwell, 748 F.3d at 1099.  Under this standard, the alleged condition must be "so extreme that it poses an unreasonable risk of serious damage to the prisoner's health or safety." Richardson v. Johnson, 598 F.3d 734, 737 (11th Cir. 2010) (per curiam).

The second element — the prison official's deliberate indifference to the risk — "has both a subjective and an objective component." Marbury, 936 F.3d at 1233.  "To satisfy the subjective component, a plaintiff must produce evidence that the defendant 'actually (subjectively) knew that an inmate faced a substantial risk of serious harm.'"  Caldwell, 748 F.3d at 1099 (citation and alterations omitted).  The defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837.  "The known risk of injury must be a strong

likelihood, rather than a mere possibility before a [prison official's] failure to act can constitute deliberate indifference." Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990) (per curiam) (quotations omitted).

To meet the objective component, a plaintiff must produce evidence that the defendant "responded to the known risk in an unreasonable manner, in that he or she 'knew of ways to reduce the harm' but knowingly or recklessly declined to act." Marbury, 936 F.3d at 1233 (citation omitted). "Merely negligent failure to protect an inmate from attack does not justify liability under section 1983[.]" Hughes, 894 F.2d at 1537.

The third element — causation — requires a plaintiff to "show a 'necessary causal link' between the officer's failure to act reasonably and the plaintiff's injury." Marbury, 936 F.3d at 1233 (citation omitted).

In his original complaint and first amended complaint, Davis described his claims against all Defendants as either "Lack of Security" or "Breach of Security" and alleged that his stabbing occurred because there was no officer monitoring his housing unit on the night of the incident, thus leaving the inmates without security. (See Docs. 1, 6). However, in his operative second amended complaint, Davis changes tack and directs his failure-to-protect claims only against Officer Thompkins, Warden Stewart, Warden Raybon, Warden Mitchell, Lt. Dailey, and Lt. Banks. (See

Doc. 41).   Davis's claims against Wardens Stewart, Raybon, and Mitchell appear to be based solely on their vaguely alleged failure to adequately train and supervise subordinates, which the Court will address in a later section of this Order.   In this section, the Court will address only Davis's claims that Officer Thompkins, Lt. Dailey, and Lt. Banks failed to protect him from being stabbed by another inmate.

<u>Defendant Thompkins</u>

Davis claims that Officer Thompkins's "refusal to protect & deter physical assaults from another inmate constituted his deliberate indifference" and resulted in Davis being injured.   (<u>Id.</u> at 6).   Davis alleges that Officer Thompkins was "the officer assigned to [D-Dorm]" but was "was not present" at the start of the altercation in which Davis was stabbed, "although he came during the physical altercation & hollered for the inmates to break-up whatever was going on."   (<u>Id.</u> at 4).

Officer Thompkins avers that Davis's claims are false.   (Doc. 85-1).   Officer Thompkins points out that he was not assigned to D-Dorm on the night of the incident according to the Post Assignment Roster, and that he was not mentioned in the Duty Officer Report.   (<u>Id.</u>).   Indeed, the Post Assignment Roster and Duty Post Log reflect that Officer Thompkins was assigned as the Rover for *C-Dorm*, and the Incident Report and Duty Officer Report differ significantly from Davis's version of the events and do not

27

mention Officer Thompkins.  (See Doc. 78-1 at 1, 3; Doc. 99-1 at 1-2).

To the extent Davis claims Officer Thompkins acted with deliberate indifference to his safety by abandoning his post as D-Rover or otherwise failing to monitor or provide security for D-Dorm prior to the subject altercation, Davis has failed to put forth probative evidence to support such a claim.  First, Officer Thompkins has shown through the Duty Post Log and Post Assignment Roster that he was not assigned as the Rover for D-Dorm on the night of the incident as alleged by Davis, but was instead assigned as the Rover for C-Dorm, and Davis has presented no evidence to the contrary.

Moreover, even assuming *arguendo* that Davis's unsupported allegations could create a genuine factual question as to whether Officer Thompkins was assigned to D-Dorm, Davis has failed to produce evidence that Officer Thompkins - or any other correctional officer at Holman - was subjectively aware that Davis faced a substantial risk of serious harm prior to the subject incident.

First, Davis presents no evidence that even he was aware or fearful of a possible attack prior to his "misunderstanding" with inmate Frank on the night of the incident.  There is no evidence that Davis and inmate Frank (or any other inmates at Holman) were considered enemies at the time the incident occurred.  Nor has Davis alleged that any correctional officer was apprised or aware

that inmate Frank or any inmate at Holman posed a risk to his health or safety prior to the altercation.  See McGill v. Duckworth, 944 F.2d 344, 349 (7th Cir. 1991) (stating that a plaintiff "normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety"), overruled in part on other grounds by Farmer, 511 U.S. at 828.  Thus, no reasonable fact finder could conclude that Officer Thompkins acted with intentional or reckless disregard to a known specific risk of harm to Davis prior to the stabbing.

Davis has also failed to produce probative evidence showing that he faced a generalized, substantial risk of serious harm from inmate violence at Holman generally or D-Dorm specifically.  The Eleventh Circuit has declared that a claim of deliberate indifference based on a generalized risk of violence may only be established by showing "that serious inmate-on-inmate violence was the norm or something close to it[,]" which is generally evidenced by "specific features of a facility or its population rendering it particularly violent[,]" such as "pervasive staffing and logistical issues rendering prison officials unable to address near-constant violence, tensions between different subsets of a prison population, and unique risks posed by individual prisoners or groups of prisoners due to characteristics like mental illness." Marbury, 936 F.3d at 1234-35 (quotation omitted).  Davis has produced no evidence suggesting that he faced a generalized,

substantial risk of serious harm from inmate violence in his dormitory at Holman. Davis has pointed to no specific features of Holman or its population rendering it particularly violent. See id. at 1235. Further, the record is devoid of evidence that "serious inmate-on-inmate violence was the norm or something close to it" at Holman. See id. at 1234. Davis does not claim to have participated in, witnessed, or been the victim of any other incidents of inmate-on-inmate violence at Holman prior to the subject incident. Nor does he claim to have been threatened with violence by other inmates prior to the incident. Simply put, Davis has failed to carry his burden of identifying "specific facts" showing "that he was in an environment so beset by violence that confinement, by its nature, threatened him with the substantial risk of serious harm." See Carter v. Galloway, 352 F.3d 1346, 1349 (11th Cir. 2003) (per curiam); Marbury, 936 F.3d at 1235.

Because the record reflects that Officer Thompkins was not assigned to D-Dorm on the night of the incident, and because there is no evidence that Officer Thompkins was subjectively aware prior to the incident that Davis faced a substantial risk of serious harm from inmate Frank or any other inmate, Davis has failed to show deliberate indifference by Officer Thompkins prior to the attack on August 31, 2019. Accordingly, summary judgment is granted in favor of Defendant Thompkins on this claim.

In his second amended complaint, Davis raises an additional

claim against Officer Thompkins for failing to protect him after initially breaking up the altercation between Davis and inmate Frank. Specifically, Davis claims that after "getting things semi-contained" and observing Davis bleeding from his neck and ear area, Officer Thompkins left the dorm to get Lt. Dailey without taking Davis to the HCU. (Doc. 41 at 5). Davis alleges that at the moment Officer Thompkins left the dorm, he "was struck from behind." (Id.).

Because Davis's second amended complaint is not signed under penalty of perjury, the Court may not consider Davis's unsworn allegations for the purpose of deciding the instant summary judgment motion. See Gordon v. Watson, 622 F.2d 120, 123 (5th Cir. 1980)[9] ("Although pro se litigants are not held to the same standards of compliance with formal or technical pleading rules applied to attorneys, we have never allowed such litigants to oppose summary judgments by the use of unsworn materials."); Piper v. United States, 392 F.2d 462, 464 (5th Cir. 1968) (holding that denials in unverified pleading were insufficient to controvert affidavit offered in support of motion for summary judgment). However, Davis has submitted the witness affidavits of inmates Veal and Herring, which are signed, dated, and subscribed as true

---

[9] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

and correct under penalty of perjury.  (See Docs. 41-1, 41-2).
Thus, they may be considered as evidence in opposition to the
motion for summary judgment.  See Roy v. Ivy, 53 F.4th 1338, 1344,
1347-48 (11th Cir. 2022).

   As noted *supra*, Inmate Veal avers that after inmate Frank's
initial assault on Davis, Officer Thompkins "came into that crowd
of inmates that had circled around the stabbing incident."  (Doc.
41-1 at 1).  Veal states that he then observed Officer Thompkins
"leaving from the crowd, alone, and without Davis[,]" and that he
observed the "Davis & Frank fight-stabbing-conflict again, go on
for about 15 minutes more after [Officer] Thompkins left the
scene."  (Id.).

   Inmate Herring avers that while he was trying to keep Davis
and inmate Frank apart during the first part of the altercation,
Officer Thompkins "came into the crowd and split them up."  (Doc.
41-2 at 1).  Herring states that he left and went back to the
shower after Officer Thompkins arrived on the scene.  (Id.).
Herring further states that after he got back into the shower,
"Frank went back to stabbing on Davis again as soon as [Officer]
Thompkins left them unattended again."  (Id. at 2).  According to
Herring, the second part of the altercation between Davis and
inmate Frank lasted fifteen to twenty minutes.  (Id.).

   The test to determine whether liability may attach to an
officer who failed to intervene in an inmate-on-inmate assault is

32

whether: (1) the inmate's physical assault created a substantial, objective risk of injury, (2) of which a defendant is subjectively aware, (3) the defendant was in a position to intervene, and (4) the defendant did not respond reasonably to the risk of injury. Johnson v. Boyd, 568 F. App'x 719, 724-25 (11th Cir. 2014) (per curiam). Here, there is no question that being stabbed with a knife by another inmate created a substantial, objective risk of injury to Davis. And, Davis has presented probative evidence in the form of two witness affidavits, signed under penalty of perjury, (1) that Officer Thompkins was subjectively aware that Davis had been involved in a physical altercation with another inmate in D-Dorm and had been injured in that altercation, (2) that Officer Thompkins was in a position to (and did in fact) intervene, (3) that Officer Thompkins did not reasonably respond to the risk of injury because he left the scene of the altercation and did not ensure that the inmates involved were securely separated from one another, removed from the housing unit, and/or disarmed, and (4) that Officer Thompkins's failure to respond reasonably to the situation caused Davis to suffer further injury.

Although Davis's version of events is denied by Officer Thompkins and is not corroborated in the institutional records, the issue of credibility may not be determined through a motion for summary judgment. At the summary judgment stage, it is not the function of the reviewing court to weigh the evidence and

determine the truth of the matter; rather, the court's function is to determine whether there is a genuine issue for trial. <u>Anderson</u>, 477 U.S. at 249. Where a fact is disputed, the non-movant's version of the fact is presumed to be true. <u>Crocker v. Beatty</u>, 886 F.3d 1132, 1134 (11th Cir. 2018) (per curiam). Davis has presented evidence showing that there is a genuine issue regarding Officer Thompkins's actions that may only be determined by a trier of fact. Thus, as it relates to Davis's claim that Officer Thompkins failed to protect him and acted with deliberate indifference to his safety by leaving D-Dorm alone after breaking up the first part of the altercation, summary judgment must be denied at this time.

### Defendants Dailey and Banks

Although not stated as a "Claim for Relief," Davis alleges that Lt. Dailey "[f]ailed to protect & deter physical assaults from another inmate" and "[f]ailed to competently supervise subordinate[s]." (<u>See</u> Doc. 41 at 3). Construed liberally, this appears to be a reiteration of the claim in Davis's original complaint that Lt. Dailey failed to fulfill her responsibility as shift supervisor to ensure that correctional officers were on their posts and all posts were secured. (<u>See</u> Doc. 1 at 6). Davis also alleges that Lt. Banks failed "to competently supervise subordinate[s]." (Doc. 41 at 3, 6). This is likewise arguably a reiteration of the claim in Davis's original complaint that Lt.

Banks "was an assigned supervisor along with [Lt. Dailey]" on the night of the incident, and that "[h]ad [Lt. Dailey and Lt. Banks] made their rounds properly then security would've been on his/her assigned post & eliminated the incident." (See Doc. 1 at 8).

In her affidavit, Lt. Dailey avers that she was conducting an institutional count along with several other officers in various areas of the facility at the time of the incident. (Doc. 78-3 at 1). Lt. Dailey also avers that "[t]here was an adequate amount of staff to provide to security on the shift." (Id.). Lt. Banks avers that all of Davis's allegations against him are false. (Doc. 78-2 at 1). Lt. Banks notes that he was assigned as the Restricted Housing Unit supervisor at the time of the incident, and he states that he was not present in the general population area of Holman when the incident occurred. (Id.).

The Post Assignment Roster and Duty Post Log reflect that there was a correctional officer (Officer Bennett) assigned as Rover for D-Dorm on the night of the incident. (See Doc. 99-1 at 1-2). However, for purposes of this motion, the Court accepts as true Davis's allegations, made under penalty of perjury, that there was no correctional officer providing security in D-Dorm on the night of August 30-31, 2019 prior to the subject incident, except during head counts. (See Doc. 1 at 4-10).[10] Nevertheless, having

---

[10] Because Davis's original complaint and first amended complaint were signed under the penalty of perjury (see Doc. 1 at 12; Doc.

reviewed the record at length, the Court finds that Davis has failed to put forth probative evidence showing that Defendants Dailey and Banks were deliberately indifferent to an objectively substantial risk of serious harm posed to Davis by inmate Frank or any other inmate prior to the altercation on August 31, 2019.

Specifically, the record is bereft of evidence that Lt. Dailey and Lt. Banks were subjectively aware that Davis faced a substantial risk of serious harm from inmate Frank or any other inmate prior to the subject incident. As discussed previously, Davis has presented no evidence that any correctional officer at Holman was aware that he faced either a known specific risk of harm or a generalized, substantial risk of serious harm prior to the stabbing incident on August 31, 2019. In the absence of such evidence, Davis has failed to establish an Eighth Amendment violation against Lt. Dailey or Lt. Banks for failing to protect him from the subject inmate attack. Thus, to the extent Davis claims that Lt. Dailey and Lt. Banks failed to protect him and acted with deliberate indifference to his safety by failing to adequately supervise subordinates and failing to ensure that there was an officer present to provide security in D-Dorm on the night

---

6 at 7), the Court will consider the factual allegations in those complaints in ruling on the motion for summary judgment. See Perry v. Thompson, 786 F.2d 1093, 1095 (11th Cir. 1986) (per curiam).

of August 30-31, 2019, summary judgment is granted in favor of Defendants Dailey and Banks.

2.   **Eighth Amendment - Failure to Provide Medical Care.**

In his "Claim[s] for Relief," Davis asserts that Lt. Dailey, Lt. Banks, Officer Thompkins, Officer Hard, and Officer Craft were deliberately indifferent to his medical needs.  (Doc. 41 at 6). To establish such a claim, Davis must show "(1) a serious medical need; (2) defendant's deliberate indifference to that need; and (3) causation between the defendant's indifference and the plaintiff's injury." McDaniels v. Lee, 405 F. App'x 456, 458 (11th Cir. 2010) (per curiam) (citing Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1306-07 (11th Cir. 2009)).

To satisfy the first element, a plaintiff must demonstrate the existence of "an objectively serious medical need." Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004).  To meet the second subjective element, a plaintiff must demonstrate "that the prison official acted with an attitude of 'deliberate indifference' to that serious medical need."   Farrow, 320 F.3d at 1243.   To establish the second element, "the prisoner must prove three facts: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence." Johnson, 387 F.3d at 1351.

> A core principle of Eighth Amendment jurisprudence in
> the area of medical care is that prison officials with
> knowledge of the need for care may not, by failing to

> provide care, delaying care, or providing grossly
> inadequate care, cause a prisoner to needlessly suffer
> the pain resulting from his or her illness.

McElligott v. Foley, 182 F.3d 1248, 1257 (11th Cir. 1999). The
Eleventh Circuit has "repeatedly found that an official acts with
deliberate indifference when he or she knows that an inmate is in
serious need of medical care, but he fails or refuses to obtain
medical treatment for the inmate." Id. at 1255 (quotation omitted).

### Defendant Thompkins

As discussed previously, there remains a question of material
fact as to whether Officer Thompkins knew that Davis had been
stabbed with a knife but nonetheless left D-Dorm without taking
Davis to the HCU or otherwise providing or obtaining medical care
for Davis. If Davis is able to establish that Officer Thompkins
observed that he had been wounded and was bleeding, it would follow
that Officer Thompkins would be responsible for taking steps to
ensure that he received medical treatment. Thus, summary judgment
is denied as to Davis's claim that Officer Thompkins failed to
obtain medical care for him after initially breaking up the
altercation between Davis and inmate Frank. The claim will be
carried and analyzed along with Davis's related claim against
Officer Thompkins for failing to protect Davis after initially
intervening in the altercation.

<u>Defendants Thompkins and Dailey</u>

Davis also alleges in his second amended complaint that after Officer Thompkins returned to D-Dorm with Lt. Dailey, Lt. Dailey instructed inmates to hide Davis in the T.V. room and cover the blood up so the other officers would not see it during the upcoming institutional count, and that Lt. Dailey and Officer Thompkins then left the dorm without taking Davis with them.  (Doc. 41 at 5).

Inmate Veal avers that "after the second round of assault, a Lt. Dailey & [Officer] Thompkins came (back) into the dorm[,]" and that Veal "watched Lt. Dailey & [Officer] Thompkins walk up to Davis personally, but they did not take Davis out of the dorm with them when they left the dorm."  (Doc. 41-1 at 2).  Veal states that "Davis was later taken to the infirmary by an inmate – nicknamed 'P.J.'"  (<u>Id.</u>).

Inmate Herring avers that after the second part of the altercation between inmate Frank and Davis, "Lt. Dailey and [Officer] Thompkins came into the dorm[,]" but he "did not see or hear about Davis leaving out of the dorm with Lt. Dailey or [Officer] Thompkins."  (Doc. 41-2 at 2).  Herring states that "[a]fter Lt. Dailey & [Officer] Thompkins left the dorm, Davis was still in the dorm, bleeding, and was not taken to the medical unit at that time."  (<u>Id.</u>).  According to Herring, it "was a good moment

in time before an inmate named: 'P.J.,' took Davis to the medical unit." (Id.).

The affidavits submitted by Davis create a genuine issue of material fact as to whether Lt. Dailey and Officer Thompkins observed Davis bleeding after being stabbed but left the dorm without providing medical care or obtaining medical treatment for him. Accordingly, summary judgment is also denied as to Davis's claim relating to the alleged failure of Lt. Dailey and Officer Thompkins to provide or obtain medical care for him after entering the dorm following the second part of the altercation between Davis and inmate Frank.

<u>Defendants Dailey, Banks, Thompkins, Hard, and Craft</u>

In his second amended complaint, Davis alleges that after other inmates took him to the T.V. room and covered him with a blanket pursuant to Lt. Dailey's instructions, Lt. Dailey, Lt. Banks, Officer Thompkins, Officer Craft, Officer Hard, Officer Pickett, and Officer Bennett entered D-Dorm and "announce[d] count time." (Doc. 41 at 5). Davis alleges that Lt. Banks, Officer Craft, Officer Hard, Officer Pickett, and Officer Bennett entered the T.V. room and told Davis to go to his bed, and when Davis stood up, the officers called for Lt. Dailey. (Id.). Davis alleges that when Lt. Dailey entered the T.V. room, she explained the situation and stated that Davis was going to lay in the T.V. room until he calmed down and went to sleep. (Id.). Davis alleges

that Lt. Dailey, Lt. Banks, Officer Thompkins, Officer Craft, Officer Hard, Officer Pickett, and Officer Bennett left him in the T.V. room when they exited the dorm, and when inmates subsequently noticed that Davis had passed out in the T.V. room, they "got another inmate nicknamed P.J., who worked on the hall[,]" to push Davis in a wheelchair to the HCU.  (Id. at 5-6).

As noted *supra*, the Incident Report and Duty Officer Report state that at approximately 3:40 a.m. on August 31, 2019, Officer Bennett observed Davis being brought to the entrance gate in a wheelchair, with blood running from his ear and nose, and Davis was then escorted to the HCU by Lt. Dailey for a medical assessment. (Doc. 78-1 at 1, 3).  The Duty Post Log reflects that at 3:39 a.m., Officer Thompkins reported an inmate from D-Dorm (presumably Davis) on the way to the HCU in a wheelchair pushed by an inmate Jones, escorted by Officers Thompkins and Bennett.  (Doc. 99-1 at 5-6).

Lt. Banks avers that he was not in the general population area of Holman when the subject incident occurred, and that all allegations lodged by Davis against him are false.  (Doc. 78-2 at 1).  Officer Hard avers that he has no recollection of the subject incident because he was on kitchen duty at that time.  (Doc. 87-2).  Officer Craft avers that he does not recall the subject incident and could not get Davis medical help because he was not assigned to D-Dorm.  (Doc. 87-3).  In his special report, Officer Craft also notes that the institutional records reflect that he

was one of two officers who subsequently transported Davis by van
to Atmore Community Hospital.  (Doc. 87 at 4; see Doc. 78-1 at 1,
3; Doc. 99-1 at 6).

The witness affidavits of inmates Veal and Herring make no
mention whatsoever of Lt. Banks, Officer Hard, Officer Craft,
Officer Bennett, or Officer Pickett, and neither inmate
corroborates Davis's assertions that Defendants Dailey, Banks,
Thompkins, Hard, and Craft left Davis in the T.V. room after
conducting the institutional count.  (See Docs. 41-1, 41-2).  The
unsupported allegations in Davis's second amended complaint, which
was not signed under penalty of perjury, are insufficient to
establish the existence of a genuine issue of material fact
regarding this matter.  The record is devoid of evidence suggesting
that Lt. Banks, Officer Hard, or Officer Craft were deliberately
indifferent to Davis's serious medical needs at any point.  The
summary judgment record is also devoid of evidence that Lt. Dailey
or Officer Thompkins left Davis bleeding in the T.V. room after
completing the institutional count.  Accordingly, summary judgment
is granted in favor of Defendants Dailey, Banks, Thompkins, Craft,
and Hard on this claim.

### 3.    Failure to Adequately Train and Supervise.

Davis raises a "Claim for Relief" that Warden Stewart, Warden
Raybon, Warden Mitchell, Lt. Dailey, and Lt. Banks violated the
Eighth Amendment by failing to "adequately train" and "competently

supervise" their subordinates.   (Doc. 41 at 6).   Construing the complaint liberally, Davis appears to connect the supervisory Defendants' alleged failure to adequately train and supervise subordinates with (1) the failure to protect him from being stabbed on August 31, 2019, and (2) the subsequent failure to provide needed medical attention for his wounds.

### Defendants Stewart, Raybon, and Mitchell

In support of their motion for summary judgment, Defendants Stewart, Raybon, and Mitchell have put forth evidence that rules, regulations, and policies were in place to help prevent incidents of inmate-on-inmate violence.   Wardens Stewart and Mitchell testify that every inmate incarcerated by ADOC is oriented with an inmate handbook that sets forth ADOC's rules, regulations, and policies, including the restriction on engaging in physical altercations.   (Doc. 78-5 at 2-3; Doc. 78-6 at 1).   A staff member reviews this handbook with every inmate.   (Doc. 78-5 at 2; Doc. 78-6 at 1).   Defendants maintain that there were also procedures in place at Holman to help reduce incidents such as stabbings, i.e., frequent unannounced searches are conducted of each inmate's person, inmate living areas, and other institutional areas to ensure the safety of the inmates; all officers are required to conduct five random searches of the inmate population daily; monthly area searches of the institution are conducted; and supervisors were required to make security checks every thirty

minutes.  (Doc. 78-4 at 2; Doc. 78-5 at 2; Doc. 78-6 at 2).  Each of the wardens, along with Lt. Dailey, have testified that there was an adequate number of correctional staff on duty on the night of the incident to provide security on the shift.  (Doc. 78-3 at 1; Doc. 78-4 at 2; Doc. 78-5 at 2; Doc. 78-6 at 2).  The Post Assignment Roster for the night shift on August 30-31, 2019 reflects that all towers and cubicles were manned, there was a rover assigned to each dorm, and a hall rover was assigned.  (Doc. 99-1 at 1).

Moreover, Warden Mitchell testifies that all supervisors were supervised adequately, and that any time a supervisor was found not be following regulations, policies, or written directives, corrective action was taken as to that employee.  (Doc. 78-6 at 2).  Warden Mitchell further avers that issues that were areas of concern with regard to regulations or policies not being followed were addressed at various staff meetings.  (Id.).

For purposes of this motion, the Court accepts as true Davis's testimony that there was no correctional officer monitoring D-Dorm on the night of the subject incident.  However, as already explained in connection with Davis's claims against Defendants Thompkins, Dailey, and Banks, Davis has failed to put forth evidence suggesting that any correctional official at Holman was subjectively aware that he faced a substantial risk of serious

44

harm posed by inmate Frank or any other inmate prior to the stabbing incident on August 31, 2019.

Even assuming *arguendo* that Davis could make such a showing, he has failed to adduce facts from which a reasonable jury could conclude that Wardens Stewart, Raybon, or Mitchell were deliberately indifferent to such a risk. Davis alleges that Wardens Stewart, Raybon, and Mitchell failed to adequately train and supervise subordinates, but he utterly fails to articulate *how* or *why* their training and supervision of subordinates was inadequate, much less provide any evidence supporting his conclusory assertion. Further, there is no allegation or evidence that Wardens Stewart, Raybon, or Mitchell were present at Holman at any point during the events at issue or personally involved in the events alleged.

Davis has also failed to adduce evidence from which a jury could reasonably find that the wardens' actions or omissions were causally related to his stabbing or the alleged failure by correctional officers to provide prompt medical attention. "It is well established that § 1983 claims may not be brought against supervisory officials on the basis of vicarious liability or respondeat superior." Keating v. City of Miami, 598 F.3d 753, 762 (11th Cir. 2010). A supervisory prison official can be held liable under § 1983 only if they personally participated in the unconstitutional conduct or if there is a "causal connection"

between the supervisor's actions and the alleged constitutional violation.  West v. Tillman, 496 F.3d 1321, 1328 (11th Cir. 2007) (per curiam).

> A causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation and he fails to do so; when the supervisor's improper custom or policy leads to deliberate indifference to constitutional rights; or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.

Douglas v. Yates, 535 F.3d 1316, 1322 (11th Cir. 2008).

Davis fails to provide any explanation or evidence connecting the wardens' allegedly inadequate training and supervision of subordinates with his stabbing or the failure to provide needed medical care.  The evidence reflects that the prison was adequately staffed on the night of the incident, with rovers assigned to each dorm, including D-Dorm, and Davis fails to identify any facts showing a causal connection between the wardens' vaguely alleged omissions and the absence of an officer in D-Dorm on the night of the subject incident.  To the extent Davis contends that the wardens are liable for correctional officers' alleged failure to provide prompt medical care following the altercation, he provides absolutely no explanation or evidentiary support for such a claim. In sum, Davis has failed to identify any facts which could demonstrate a causal connection between the wardens' acts, omissions, customs, or policies and his stabbing or alleged lack

of prompt medical care.  Accordingly, Davis has failed to establish an Eighth Amendment violation against Defendants Stewart, Raybon, or Mitchell, and summary judgment is granted in favor of those Defendants.

### Defendants Dailey and Banks

With regard to Lt. Dailey and Lt. Banks, who were shift commanders at Holman on the night of the incident, it is unclear whether Davis's inadequate training and supervision claims are simply reiterations of the claims the Court has already addressed above, or whether Davis is alleging some additional unidentified failure or deficiency on the part of Lt. Dailey and Lt. Banks.  To the extent Davis brings claims against Lt. Dailey and Lt. Banks for failing to adequately train and supervise subordinates that do not relate to those Defendants' actions or omissions on the night of the incident, he provides no support for such claims.  Lt. Dailey testifies that she is not responsible for ADOC training. (Doc. 78-3 at 1).  Lt. Banks similarly avers that as a shift commander, he is not in charge of training subordinates or staff, that all ADOC security personnel must complete training at the Training Academy, and that annual training is conducted by ADOC's Training Department.  (Doc. 78-2 at 1).  Davis has put forth no evidence contradicting the lieutenants' testimony that their job responsibilities did not include training subordinates.

Furthermore, as noted previously, Davis has failed to adduce

evidence that any correctional official at Holman was subjectively aware that he faced a substantial risk of serious harm posed by inmate Frank or any other inmate prior to the stabbing incident on August 31, 2019.  To the extent Davis claims that Lt. Dailey and Lt. Banks failed to adequately train subordinates or failed to adequately supervise subordinates prior to the night of the incident, he has offered no evidence or even explanation supporting his assertion.  Nor has Davis put forth any evidence showing a causal connection between the subject incident and his conclusory assertions of inadequate training and supervision.  Davis has thus failed to establish an Eighth Amendment violation against Defendants Dailey or Banks for failing to adequately train or competently supervise subordinates, and summary judgment is granted in favor of Defendants Dailey and Banks with respect to such claims.

## IV.  <u>CONCLUSION</u>

Based on the foregoing analysis, it is **ORDERED** that the motion for summary judgment is **GRANTED in part** and **DENIED in part**.

Specifically, the motion for summary judgment is **GRANTED** as to all claims asserted against Defendants Stewart, Raybon, Mitchell, Banks, Craft, and Hard, and these Defendants are entitled to judgment as a matter of law.  Additionally, the motion for summary judgment is **GRANTED** as to all claims asserted against the Defendants in their official capacities.

Moreover, it is **ORDERED** that the motion for summary judgment is **GRANTED** in favor of Defendant Thompkins as to the following claims: (1) that he failed to protect Davis by abandoning his post as Rover for D-Dorm or otherwise failing to monitor or provide security for D-Dorm prior to the subject altercation, and (2) that he acted with deliberate indifference to Davis's serious medical needs by leaving Davis in the T.V. room after officers conducted the institutional count. Further, it is **ORDERED** that the motion for summary judgment is **GRANTED** in favor of Defendant Dailey as to the following claims: (1) that she acted with deliberate indifference by failing to protect Davis from the August 31, 2019 inmate assault; (2) that she acted with deliberate indifference to Davis's serious medical needs by leaving Davis in the T.V. room after officers conducted the institutional count; and (3) that she violated the Eighth Amendment by failing or refusing to adequately train and supervise subordinates.

However, it is **ORDERED** that the motion for summary judgment is **DENIED** as to Defendant Thompkins on the following claims: (1) that he acted with deliberate indifference to a substantial risk of serious harm to Davis's safety by leaving the dorm after initially breaking up the altercation without ensuring that the inmates involved were securely separated from one another; (2) that he acted with deliberate indifference to Davis's serious medical needs by failing to obtain medical care for Davis after

initially breaking up the altercation between Davis and inmate Frank; and (3) that he acted with deliberate indifference to Davis's serious medical needs by leaving Davis in the dorm without providing or obtaining medical care for him after re-entering the dorm with Lt. Dailey following the second part of the altercation. It is likewise **ORDERED** that the motion for summary judgment is **DENIED** as to Defendant Dailey on the claim that she acted with deliberate indifference to Davis's serious medical needs by leaving Davis in the dorm without providing or obtaining medical care for him after re-entering the dorm with Officer Thompkins following the second part of the altercation.

Finally, it is **ORDERED** that this matter is hereby **REFERRED** to U.S. Magistrate Judge Sonja F. Bivins, to enter a discovery and trial schedule.

**DONE** this **27th** day of **March, 2023.**

<u>/s/ Kristi K. DuBose</u>
**Kristi K. DuBose**
**UNITED STATES DISTRICT JUDGE**